We'll hear argument first in No. 2009-1193, Censormatic v. Tag Company. Mr. Waters, you've reserved four minutes for rebuttal, is that correct? Yes, Your Honor. Very well. You can begin when you're ready. Your Honor, it's Robert Waters for Phoenix Label, and we're here today to ask you to find the District Court's ruling of inequitable conduct and public use bar to be clearly erroneous in light of the testimony presented. And this is an unusual situation in the sense that it is a highly material reference that we're talking about, the 033 patent, that was the subject of reexamination, and the Patent Office concluded that it was highly material. In fact, it's anticipatory. And notwithstanding that, which the Censormatic did not, they acquiesced to this finding and simply canceled or modified claims. Well, suppose that it is highly material. Suppose the District Court was wrong about that and you're right about that. Yes. How do you get over the intent hurdle? Yes. In this case, intent to deceive can be found by virtue of the fact that Censormatic and these inventors have told conflicting stories, implausible stories, about how this reference didn't get submitted as well as other references and items that they had sold that embody these references. Well, the District Court considered their testimony. We're talking about the two inventors, correct? Yes, Dr. Coffey and Copeland. Do you contend that the prosecuting attorney committed inequitable conduct as well? Probably, but in this case, the testimony supports that those two inventors did. Well, what is your position? You're contending here that the two inventors committed inequitable conduct and we should so find? Yes, that is my contention. And not the prosecuting attorney. That is correct. Did the prosecuting attorney testify? No. With respect to the two inventors, they testified, provided the District Court with an explanation of why they didn't consider or didn't cite the references in question, and the District Court found that testimony plausible. How are we supposed to overturn that? Well, they submitted several different conflicting stories at the District Court, and the primary story that they submitted, which was not the basis for their non-submission, but the inventors claimed that they read an imaginary limitation into all of these claims. There's an imaginary limitation of abruptness, and that this is their primary story. We're really talking about Claim 4, principally, aren't we, of the 200 patents? Yes, except that they read that. There are other claims that don't have that same problem, that have continued, of course, that survived the re-examination, right? There were a number of claims that were amended or canceled due to the re-exam, and some that were not. Right, and those that were not survived in their original form. Largely, yes. So they were fine. Yes, absolutely. From day one. Yes, some of them were from day one, absolutely. But on one hand, they say that they read this imaginary limitation in, and that is a plausible explanation for non-submission. But yet, what the inventors testified to at trial, they said that they never gave it any thought. Inventor Coffey said, he doesn't recall Lew ever being considered. Copeland testified, they didn't give it any thought at all. So how can it be that they didn't submit because of this imaginary limitation, which I believe itself that's not plausible, but also the alternative story that it was never considered at all. Then they even tell a third story, which is that it's cumulative over the Anderson 489 patent. And this, I believe, is inconsistent. You know, they can't all be the case at the same time. The district court made no findings about the explanations that the inventors actually gave about why they didn't consider it at all. Don't you think that there'd be a pretty good argument if Claim 4 had survived, that it should be construed to include an abruptness limitation? I don't believe there's any way it could be. There's nothing in there at all. The invention is described throughout the patent as involving abruptness as well as low coercivity, right? No, it is described that way in some parts of the patent, but also it says that... By the abstract and the summary? I mean, is there some place where it's described as going beyond that? Yes, there's one place where it says that another aspect of this invention is an EAS marker that simply has a coercivity below 55 Erston. And that says nothing about abruptness. So you have to read this into the spec, and it's not even in adjacent claims. None of the claims, not a single claim, uses this term abruptness. It's used in the title of the patent, but it is not something that it's plausible to read that into. Furthermore, when they testify themselves that this is not the basis for non-submission, they also testified that when they were choosing... I'm sorry, what did you mean by that last sentence? They testified themselves that this was not a basis for the non-submission? Yes. I thought they testified that they read the claims as including an abruptness limitation, and that's why they thought the 033 wasn't pertinent. They say that they read this imaginary abruptness limitation in there, but when the question is asked, well, why didn't you submit Lew to the patent office, Lew 033, the answer was, we never considered it, we didn't discuss it at all. And that is... Why is that inconsistent with the other? It's inconsistent because either you considered it and you excluded it because it's not abrupt, or you never considered it at all. So it couldn't be both of these things. Well, then maybe they didn't consider it because they didn't have in mind that the claims in question did not have an abrupt limitation in it. Well, they provided an explanation for why they did disclose the four patents that they did pick. They did disclose four patents, none of which has anything to do with abruptness, and their explanation was that when they were choosing the patents to submit, they, quote, had nothing to do with their invention, had nothing to do with abruptness, and they were just historical references to AM markers. That was Dr. Copeland on page 853 of the appendix. Is there any other testimony or any other evidence of any kind of culpable conduct whatsoever on the part of these inventors? Yes, there is. For one thing, Dr. Coffey testified that even though now he knows what the reexamination found, he knows the Patent Office considers this to be highly material, notwithstanding that, he still maintains he would do it again. He has no duty to disclose lieu even now. Well, not now, but as of the time of the trial. Because of cumulativeness? Because he doesn't think it's material. Why doesn't he think it's material? Because it's cumulative of the other references? That's probably true, although this particular quote he did not elaborate. But he continued to maintain that, as far as he's concerned, he didn't have a duty to disclose, regardless of what the reexamination had to say. In addition to Judge Lynn's question about any other culpable intent, these inventors failed to disclose publicly used and commercial embodiments of markers that were below 55, including markers made pursuant to lieu. And that was important because, certainly, after the reexamination, these guys had to know that the Patent Office finds this to be highly material. Yet they had sold, and otherwise, in some cases not sold, but distributed without sale, labels since 1994 that were made pursuant to lieu 033. And at the point of reexam, you know now it's material. They still did not disclose this to the Patent Office at any time. Is there any evidence that the inventors knew about these public uses at the time the application was originally pending? Yes, there is. First of all, there's two different types of materials, TCA and Arnicrome 4. With respect to TCA, Copeland himself had a role in setting the production spec for TCA back in 1994, where it was set at being 50 to 80. And he also confirms on 845 of the appendix that the TCA product is made pursuant to lieu. He is, incidentally, a co-inventor of lieu. With respect to the other material at issue, Arnicrome 4, this was the material that was publicly used, although disagreement as to whether it was sold, but it was publicly used since 1994. Well, wait. That's not the testimony. The testimony is it was sold sometime in the 1994-1995 time frame, which doesn't put it in 1994 necessarily, right? Well, Mr. Patterson testified that it was 1994-1995 time frame. That was corroborated by another witness. Well, that may be true, but what was the critical date? Was August of 1995, something like that? Yes, it was. So something that's sold in the 1994-1995 time frame is not necessarily sold or used before the critical date, right? Well, actually, the patent was filed in 1996, so the critical date is August of 1995. So anything sold in 1994 would be ahead of time. Yes, but my problem is the testimony is not clear as to whether he's saying it's sold in 1994 or whether he's saying it's sold in 1995, and he doesn't pinpoint what date in 1995 he's talking about. So the testimony is unclear and leaves open the possibility that this was sold or used after the critical date rather than before, right? Well, that particular testimony, but then that is corroborated by another witness, Ms. Bolson, who said it was 1994. Wasn't she the witness that the district court discredited? They found her testimony that it was sold to be not credible. There was a disagreement between whether it was sold or given away, but the two witnesses said, Mr. Patterson said, that he does not take exception with Bolson that it was publicly used, only takes exception that it was sold. Where is the district court? I can't put my finger on the district court's finding with respect to her credibility. Do you have that readily at hand? I don't have that. Well, I'll find it. That's fine. Okay. I also want to draw your attention to the Joint Appendix 4311, which is a statement authored and testified to by Copeland that he knew that these Arnachrome 4 labels had a coercivity below 50 and that in packages of more than 1,000, there were deactivation problems, and the date on that is March 1994. So this would establish that Dr. Copeland knew in March 1994 that these… What page is that on? Of the Joint Appendix 4311. Well, now, 4311, I just have a chart here. That's not what you're talking about, is it? That is what I'm talking about, Your Honor. Okay. Now, what did you say that shows? If you read that, it indicates in there, he's talking, it's a problem statement that he's addressing this deactivation. And if you look in the first paragraph under solution, you'll see that the date of March 2894 is referenced. And in the beginning, it says, for bias magnet material with coercivity below 50, and in the same paragraph, it references Arnachrome 4. Now, this doesn't have Dr. Copeland's name on it, but he testified to it at trial. And his testimony authenticating this document is in the Joint Appendix 906 through 908. But why does this document show that these labels were sold before the critical date, or used before the critical date? Because the critical date, what this document says and suggests is that this problem existed. The problem of when you ship out boxes of more than 1,000… Well, I understand that, but how does it show that the labels were actually distributed for use before the critical date? I mean, it suggests perhaps that this label was designed before the critical date in 1994, but how does it tell us that the distribution took place before the critical date? Well, it also says that it's packaged in quantities of 1,000 or more in March 28, 1994. So we would have to believe that it was packaged, and it had the deactivation problems in the packaging, but it was never sent out or used. I think in concert with what Mr. Patterson and Ms. Paulson had to say, the clear implication here is that Dr. Copeland was aware of this use. You are into your rebuttal time. Would you like to save the matter? I think I'd better go. Thank you. Mr. Levine. May it please the Court. Before getting to my main points, I want to briefly make two points. First, Judge Bryson asked where was it that the district court discredited Bolson's testimony. That's on page A20, paragraph 86. Second, Mr. Waters just referred to A4311, that memo. What he didn't tell you about is the testimony by Dr. Copeland about that memo, and that's at page A908. Copeland said, sure, if we were looking at the AK-4 labels in sheets, that's what we do as part of the internal testing. We make the labels in sheets, and then we test it that way. So what the evidence from Dr. Copeland, his testimony shows, is that just because they made the labels into sheets doesn't mean that it was distributed to the public on that date. Now, back to what I— That testimony was A920? Sorry, I just closed it. 908, was it? 908. 908. Thank you. This question about what Phoenix says in the reply, and again today, the inventor has never even considered whether to submit the 033 patent to the Patent Office. That should end the whole debate right there about whether or not there was intent to deceive, because after all, in Starr Scientific and quoting from the Mullins case, the holding was there had to be a deliberate decision to withhold a known material reference. If the inventor has never considered whether or not to disclose the 033, you cannot have a deliberate decision to withhold a material reference. You don't have to go that far, do you? What's that? You don't have to go that far. You don't have to go that far, but what I'm saying is that in the reply, Phoenix essentially, by making that statement, admits that you can't have an intent to deceive. If somebody knew about something and it was highly material and they said they didn't consider submitting it and that's all that they said, that might be a problem. It might be, except when you have the district court looking at those witnesses and finding it's credible. Now, what's credible is the reason why they didn't consider it, and the reason here what the district court found is because of how they read the claims. They read all these claims as dealing with abrupt markers based upon their understanding of what their invention was, the title, the summary, everything refers to the abruptness. The district court looked at that, found it to be a credible explanation. Mr. Waters referenced a passage in the patent, which I couldn't put my finger on, that goes beyond abruptness. He said that reflects an embodiment that would not include an abruptness requirement. Yeah, that's not correct. All of the embodiments have an abruptness requirement. Here's what it says. It talks about the aspects of the invention. In the summary, there are several different aspects of the invention that are talked about, and one of those aspects is having lower coercivity. And that makes sense because, after all, there are some claims that have, claim four, obviously, is what we've been focusing on, but there are other claims that have lower coercivity plus some other, you know, something else. But what's interesting here is why is it the lower coercivity is in there at all, Well, that doesn't help you, it seems to me. If the specification suggests that four doesn't require abruptness, that that's the source of a problem rather than a solution to a problem. Right. The specification doesn't say that you don't have to have abruptness. In fact, what abruptness does is it allows you to have a useful lower coercivity bias material. And what testimony was from Dr. Coffey, for instance, is that you could, in the prior art, you could have all kinds of different bias materials, including lower coercivity, and that was disclosed in the background section. But what you don't have is anything that's useful. And what the abruptness allowed you to do is get something so it's lower in coercivity, but useful so it wouldn't easily demagnetize. Cutting to the chase on this issue, to go back to Judge Dyke's original question of Mr. Waters, the patent does happen sometimes, that broad claims get read narrowly in light of the specification. And so the question is, can this patent, can this claim for a reasonably be read, or would it be likely to be read to include an abruptness requirement? Now, your contention is that it would, I take it, be read that way. Yes, it could be. Because we don't need to decide what the court ultimately would do in a claim construction context. But Mr. Waters says, well, that can't be because there is material in the specification that goes beyond requiring abruptness with respect to all of what the invention claims to be claiming. Now, what I didn't understand from your answer, are you saying that's just not so, or that there's a different response to that contention? It's just not so. All of the embodiments of the invention, all the discussion of the invention is using abruptness. One aspect of the abruptness is abruptness allows you to get a low coercivity bias that is useful. Understood. But you still have to have the abruptness, and that's what the patent talks about. So you say that even references, even discussions of lower coercivity, are in the context of an assumed application across the board of an abruptness requirement. Yes, because otherwise the lower coercivity wouldn't be useful. What specific portions of the text were you referring to as describing one aspect of the invention as having a lower coercivity? I think it's in A145, column 3. Column 3, line 20? Yes. 20 through 24 or thereabouts? Correct. So your argument then is that that paragraph opens with a clause according to a second aspect of the invention in such a marker, such a marker being a marker that has some of the objects, the objects being achieved by the character of abruptness. Yes, sir. And the testimony, and it's not just that you read it that way, but that's exactly how the inventors read it when they, and the testimony was fairly consistent, it was extremely consistent, but in uniform that that's how both inventors read the claim for, as well as all the other claims of the patent. What about the 102B issue? 102B issue, there are a couple of different points. One is what you have by, what you had was testimony by one person, Mr. Patterson in rebuttal, talking about some field testing, but you don't have any corroboration of what he said, and the cases are clear, you have to have some kind of corroboration. He says there was field testing in the 94-95 time frame, doesn't give anything more detailed than that. In fact, it's interesting in Phoenix's brief they talk about he didn't, no more than what he knew. So, yet that's what they're relying upon for their 102B argument. That kind of vague reference to 94-95 isn't enough in terms of the time frame. Second, what Mr. Waters does is he refers to corroboration by Bolson, of course that's corroboration that the district court found to be not credible, but also you're talking about different things. Patterson was talking about field testing of markers with Arnachrome 4 bias. What Bolson talked about was sales that she saw with the bias. They're talking about different things. You don't corroborate someone saying A by saying, well, no, B happened. That's not corroboration. But there's a more fundamental problem with the public use argument, which is for there to be a public use, there has to be proof that what was publicly used met the limitations of each of the asserted claims. You have to go claim by claim. But there was no claim by claim evidence of what the properties were of the Arnachrome 4 that was field tested in the 94-95 time frame. Well, the record's pretty confusing about that, isn't it? No, the record's pretty clear. There's no evidence of the properties of the particular labels. Well, there is some testimony suggesting that the material didn't change and that later on when you tested it and found that it was within the sculpted claims, that it was the same thing. Now, I understand there was testimony the other way. The testimony's very unclear, but at least there's enough testimony that someone could find that it was the same material that was tested later on. I disagree, but more important, the district court didn't find that. The district court found that it didn't include every element. What the district court looked at in particular was a memo from May of 1996. This is A4085, where the inventors, after the invention, were looking at, can we use Arnachrome 4 in the invention? And some testing was done, and they found, no, we can't. It's too gradual. It's not abrupt enough for what we're looking for. And there was data contained within that memo that specifically shows that there was a failure to meet the saturation limitations of four of the 18 asserted claims. Now, what's that? Well, the data in that memo was specific to the saturation, and the saturation limitation is found in four of the 18. There are others as well. I can talk about those if you want, but there's a May 1995 memo, which has data that supports that AK4, as of that time, didn't meet it for a certain other of the asserted claims as well. Now, and that's A5892. So what Phoenix does is they say there was no change, but the evidence actually shows that the Arnachrome 4 in 2006 was processed differently, and it's not just. . . I don't understand. Why aren't you satisfied by saying that the record's confusing and the district court made a fine? Why are you arguing that the record is crystal clear? Because I think the record wasn't. . . I think there was an attempt to create confusion, but the record clearly showed that there was processing that occurred in 2006 and that when you take this material and process it differently, you're going to get different magnetic properties. Even the specification for Arnachrome 4, the 1997 specification, says it can be processed to meet different properties and ranges from 20 to 55 ERSTED in coercivity. So I wanted to address briefly what Phoenix says about this experimentation in 2006 in their reply. They make two points. First they say, well, this was later experimentation. It came after they started selling the Series 58 labels. That's just not the case. They don't say any evidence for that, and what you see is there's testimony from Mark Hipschman, a Phoenix employee, at A702 and A703 where he says that Phoenix started using the Arnachrome 4 labels at the end of 2006, beginning of 2007. Those dates are important because all of the memos on the experimentation and processing that was going on at Arnold for Phoenix was earlier in the spring of 2006. So this argument that the experimentation is not related to the Series 58 labels is belied by the record. The other thing that Phoenix points out is they refer for the first time in the reply to the so-called FISH markers. Those are markers that were put together by Dr. FISH, their expert, and the district court referred to them as FISH markers. And they say, see, those show that Arnachrome 4 met the limitations. In fact, two points on that. One is the district court found the FISH markers didn't meet all the limitations of the asserted claims. That's A15, paragraph 67. Second, again, going back to what has to be shown here with Arnachrome 4, Phoenix has to show what the properties were of the Arnachrome 4 that was field tested in this 94-95 time frame. There's no direct evidence of that. So this attempt to extrapolate by referring to the FISH markers fails because their own employee, Mr. Hipschman, testified the FISH markers were processed specially for Phoenix in 2006, and that's page A704, 732.1-15 of the transcript. So on the 102B issue, you've got vague testimony about a time frame that's insufficient to invalidate, and you have insufficient evidence of meeting each of the limitations of each of the asserted claims that the district court found, either of which is a basis for finding that the district court's findings were not clearly erroneous. Thank you very much. Thank you, Mr. Green. Mr. Waters, do you have a comment about the timeline? Yes, Your Honor. If I may just point out just a few moments, but the markers that Dr. Fish made are detailed in how he made them, and that is on A1019-32, and the testimony by Mr. Nelson at Arnold Engineering is very clear that the Arnachrome 4 sold and used by the defendants is exactly what they had from 1994. Other experimentation, later experimentation, that doesn't change. I mean, he testified, and it was unrebutted, that it was exactly the same material from 1994, and Dr. Fish testified this process in exactly the same way. Is that all? Thank you. The case is submitted.